UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| HIGHER TASTE, a Washington nonprofit corporation,<br><br>              Plaintiff,<br><br>     v.<br><br>CITY OF TACOMA, a metropolitan municipal corporation; METROPOLITAN PARK DISTRICT OF TACOMA, a department of the City of Tacoma; JACK C. WILSON, Executive Director of the Metropolitan Park District of the City of Tacoma,<br><br>              Defendants. | CASE NO. C10-5252BHS<br><br><br>ORDER GRANTING PRELIMINARY INJUNCTION |

This matter comes before the Court on Plaintiff's motion for a temporary restraining order ("TRO") and for preliminary injunction. Dkt. 2. The Court has considered the pleadings filed in support of and opposition to the motion and the remainder of the file and hereby grants Higher Taste's motion for a preliminary injunction as discussed herein.

## I. PROCEDURAL BACKGROUND

On April 14, 2010, Higher Taste filed its complaint. Dkt. 1. On April 15, 2010, Higher Taste filed the instant motion. Dkt. 2. On April 19, 2010, Defendant Metropolitan Park District of Tacoma ("Metro") filed its initial response. Dkt. 10. On April 21, 2010, Higher Taste replied. Dkt. 13. On April 21, 2010, the Court denied the TRO but set a

ORDER - 1

hearing on the motion for preliminary injunction. Dkt. 15 (permitting the parties to file supplemental briefing in this matter). The parties filed supplemental briefing. *See* Dkts. 18, 21, 24. On May 18, 2010, a hearing on the preliminary injunction was held. Dkt. 26.

## II. FACTUAL BACKGROUND

"Plaintiff, Higher Taste, is a nonprofit, religious corporation organized and operated under the laws of the State of Washington." Complaint ¶ 4. Higher Taste's "specific purpose is to propagate, through the dissemination of educational literature and other expressive items, such as message-bearing T-shirts, the principles of non-violence, animal protection, vegetarianism, and spiritual ecology (as set forth in the Vedic literatures of ancient India) to interested members of the public." *Id*.

Defendants are the City of Tacoma ("City"); Metro, an independent government agency division of the City of Tacoma; and Jack C. Wilson ("Wilson"), the executive director of Metro. *Id*. ¶¶ 5-7.

This matter concerns Higher Taste's activities at or around the Point Defiance Zoo and Aquarium ("Zoo"), which is located within the City of Tacoma. Higher Taste's activities include, among other things, the display, sale, or exchange for donation of message-bearing T-shirts at or around the Zoo. *Id*. ¶ 8. Higher Taste began these activities in or around 1993. *Id*. ¶ 14. At that time Higher Taste was engaged in such activities "on the walkways leading to and in front of the Zoo." *Id*.

In 1995, Higher Taste alleges, Metro "instituted a permit system that sought to impose a 'vendor fee' of ten dollars per day, or ten per cent of Higher Taste's daily gross, whichever is greater. The Park District also sought to limit Higher Taste's permit periods to five day intervals." *Id*. ¶ 15. Higher Taste formally protested this measure; it was never enforced. *Id.* ¶ 16.

In 2005 Metro adopted Metro. Park Dist. of Tacoma, Res. No. 40-05 ("Resolution 40-05"), which Higher Taste claims affected its First Amendment right to speech.

Complaint ¶¶ 17-19 (noting that Metro urged the City to adopt an ordinance with the "same restriction").[1] Resolution 40-05 provides that "[n]o person shall *sell or offer for sale* any goods, wares, merchandise . . ., within the entranceway to the [Zoo], pathway or the parking area adjacent thereto." Declaration of Gary Geddes (Geddes Decl.) ¶ 5 (quoting resolution and citing to exhibit A of the declaration).

Higher Taste contends that the following has occurred after Metro adopted the resolution:

> Higher Taste was prohibited from selling its message-bearing T-shirts on the walkways leading to and in front of the Zoo, or distributing their T-shirts in exchange for a voluntary donation. However, at that time, an alternative location was provided on level B of the parking lot, which is well over 100 yards from the walkways leading to and in front of the Zoo.

Complaint ¶ 20. In June 2010, Higher Taste alleges, Metro informed Higher Taste that it could no longer sell or receive donations for their T-shirts on level B. *Id.* ¶ 24.

The present motion followed these events. *See id.*

### III. DISCUSSION

Higher Taste filed this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-02 (Dkt. 1, Complaint ¶ 1), challenging the constitutionality of Resolution 40-05. *Id.* Higher Taste moves the Court to order a preliminary injunction against Metro preventing its enforcement of Resolution 40-05. Higher Taste alleges that this resolution is an unconstitutional restriction of its First Amendment right to speech. Dkt. 2.

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving

---

[1]In 2007, the City passed Tacoma, Wash. Mun. Code § 8.27.090. *Id.* ¶ 19. This ordinance provides that "No person, except duly authorized concessionaires, and those having a specific permit, shall sell or offer for sale in any park any goods, refreshments, photographs, or other articles." *Id.* (quoting § 8.27.090). At the May 18, 2010, preliminary injunction hearing the parties noted that § 8.27.090 is not the subject of this litigation; instead, Higher Taste currently takes issue only with Metro because of constitutional concerns over Resolution 40-05; for now, the City of Tacoma remains a nominal party.

party in the absence of preliminary relief; (3) that a balance of equities tips in the favor of

the moving party; and (4) that an injunction is in the public interest. *Winter v. Natural*

*Res. Def. Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 376 (2008).[2]

**A.    Likelihood of Success on the Merits**

    **1.    Protected Activities, First Amendment**

       This case involves Higher Taste's facial First Amendment challenge to Resolution

40-05. *See generally* Complaint. The First Amendment provides: "Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise thereof; or

*abridging the freedom of speech*, or of the press; or the right of the people peaceably to

assemble, and to petition the Government for a redress of grievances." U.S. Const.

Amend I. (Emphasis added). The First Amendment is applicable to the states and to their

political subdivisions. *See Lovell v. Griffinin*, 303 U.S. 444 (1938).

       As an initial matter, the Court must determine whether Higher Taste's activities

(i.e., selling message-bearing T-shirts) are protected by the First Amendment. It is well-

settled that the reference to "freedom of speech" in the First Amendment protects more

than oral expression. *E.g., Cohen v. California*, 403 U.S. 15 (1971) (protecting words

written on clothing); *Tinker v. Des Moines Independent Cmty. Sch. Dist.*, 393 U.S. 503,

505-06 (1969) (protecting black arm bands worn in protest of the Vietnam War). Higher

Taste is selling message-bearing T-shirts to explicate "principles of non-violence, animal

protection, vegetarianism, and spiritual ecology (as set forth in the Vedic literatures of

ancient India)." Complaint ¶ 4. Such activity is protected by the First Amendment. *See*

---

    [2]Traditionally, injunctive relief was also appropriate under an alternative "sliding scale" test. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). However, the Ninth Circuit overruled this standard in keeping with the Supreme Court's decision in *Winter*. *American Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (holding that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable").

*Friends of the Vietnam Veterans v. Kennedy*, 899 F. Supp. 680 (D.D.C. 1995). Further, Metro does not "dispute that the statements on Higher Taste's T-shirts fall within the ambit of the First Amendment." Dkt. 18 at 8.

Additionally, it appears from the briefing and the hearing on the matter that Metro takes the position that the act of selling, as distinguished from giving away goods, is not constitutionally protected in the free speech arena. *See, e.g.,* Dkt. 18 at 9. This is inaccurate. The Ninth Circuit previously rejected such an argument. *One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1012 (9th Cir. 1996) (reaffirming the holding in *Guadiya Vaishnava Soc'y v. City and County of San Francisco*, 952 F.2d 1059 (holding that, "when the sale of merchandise bearing political, religious, philisophical or ideological messages is 'inextricably interwined' with other forms of protected expression . . ., the First Amendment applies")). The Court likewise rejects any such argument made here by Metro.

Therefore, the Court concludes that Higher Taste's activities are protected by the First Amendment. However, this is not to say that Metro cannot craft a valid regulation banning sales in general. *See One World*, 76 F.3d at 1013 (upholding such a ban).

### 2.    Time, Place, and Manner Restrictions

The government and its political subdivisions (e.g., Metro) may impose reasonable time, place, and manner restrictions on speech in a public forum "if (1) it is content neutral; (2) it is narrowly tailored to serve a significant governmental interest; *and* (3) it leaves open ample alternative channels of communication." *Edwards v. City of Couer D'Alene*, 262 F.3d 856, 862 (9th Cir. 2001) (emphasis in original).[3] It is the government's

---

[3]Metro concedes that the Zoo is a public forum and the parties conceded at the May 18, 2010, preliminary injunction hearing that the resolution is content neutral (i.e., it is justified without reference to content of regulated speech). The Court also notes without citation that ample case law supports such a finding even absent the parties' concessions.

burden to establish the presence of these three factors. *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir. 1981). Where the government fails to meet its burden with respect to any of these three prongs, the restriction will be held unconstitutional. *Coeur D'Alene*, 262 F.3d at 862. "To justify any intrusion [on First Amendment rights] at all, there must be a threshold showing that the factual situation demonstrates a real need for the government to act to protect its interest." *Ass'n of Community Orgs. for Reform Now v. St. Louis County*, 930 F.2d 591, 595 (9th Cir. 1991).

### 3.    Narrow Tailoring

The Supreme Court has expressed that while "a regulation of the time, place, or manner of protected speech must be *narrowly tailored* to serve the government's legitimate, content-neutral interests[,] it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (emphasis added). Narrow tailoring will be found "so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id*. at 799 (citation omitted).  Further, "the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id*. at 800.

In evaluating a content-neutral resolution the Court must first identify and analyze the purported content-neutral interests of Metro. *See Ward*, 491 U.S. at 798. The content-neutral resolution will be narrowly tailored "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. *United States v. Albertini*, 472 U.S. 675, 689 (1985). A complete ban can be narrowly tailored if "it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Shultz*, 487 U.S. 474, 486 (1988).

Metro first asserts that the resolution is narrowly tailored to serve its significant interest in protecting the public safety and park aesthetics. Dkt. 18 at 12-16. However,

whether safety or aesthetics constitute significant governmental interests is not at issue here; they likely represent unquestionably significant interests, in the abstract. *See id*. Rather, the question is whether Metro's resolution is narrowly tailored to achieve this stated interest. *See id*.

Aesthetic considerations must be "carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 510 (1981). Here, Metro relies on several cases to support its position that it can, in an effort to promote its aesthetic concerns, enact a resolution to completely ban sales within a certain area of the Zoo. *See* Declaration of Mark R. Roberts (Dkt. 29), Exs. 1, 2 (photographs of the Zoo's property containing a demarcation of the restricted zone wherein sales may not occur pursuant to Resolution 40-05).

In urging the Court to uphold its ban on sales under Resolution 40-05, Metro cites to several cases to support its position that the resolution promotes its substantial interest in Zoo aesthetics. *See*, *Clark v. Community for Creative Non-Violence*, 468 U.S. 228 (1984) (upholding ban on sleeping in national parks during demonstrations where the city established that camping would cause unreasonable "wear and tear" on the park, which would negatively affect the park's attractiveness); *Ward*, 491 U.S. at 797 (city submitted evidence that "inadequate [sound] amplification had resulted in the inability of some audiences to hear performances" and this negatively affected the ability of visitors to enjoy the benefits of the park); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984) (concluding that the city's ban on the positing of signs on public property promoted aesthetic values and stating that posted signs by their very nature can be perceived as an aesthetic harm); *Metromedia,* 453 U.S. at 510 (similar to *Taxpayers* but in regard to billboards, noting that "[i]t is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm'"); *White House Vigil for ERA*

*Committee v. Clark*, 746 F.2d 1215 (C.A.D.C., 1984) (upholding a ban regarding the regulation of sign size to promote the governmental interest in preserving unobstructed views to the White House). However, these cases are distinguishable. Metro has not presented sufficient evidence to support the proposition that Higher Taste's activities actually impair the Zoo's aesthetics or that such an impairment is inherent (i.e., not speculative) in regard to their activities. Therefore, on the current record before the Court, Metro's reliance on these cases is rejected.

Metro also relies on *One World*, a case where "the Ninth Circuit held that government has a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter." Dkt. 18 at 14 (quoting *One World* 76 F.3d at 1013). *One World* upheld an ordinance banning the sale of merchandise on commercial city streets. *Id*. at 1014 (ordinance effectively banned the sale of message-bearing T-shirts). Notably, however, *One World* involved two densely populated commercial streets in Waikiki that the city of Honolulu believed would be visually unpleasing if it did not completely ban "unsightly vendor stands." *Id*. at 1013. Although the court in *One World* upheld a ban on sales, which included message-bearing T-shirts, it did not hold that every ban on sales for a particular area would be upheld. The court must still inquire into the facts of a particular case.

Unlike *One World*, this matter presents evidence of only one group seeking to set up one table to sell constitutionally protected messages in the form of T-shirts. *See id*. At the hearing, Metro provided two pictures of Higher Taste's T-shirt stand. It is difficult to compare the visual blight discussed in *One World* with what Higher Taste's small table would look like to visitors of the Zoo. Moreover, while Metro speculates that the Zoo would be overrun with vendors if they are enjoined from enforcing the resolution, such speculation is not sufficient to justify the intrusion on Higher Taste's right to free speech at a public forum. Additionally, Metro has not provided sufficient evidence in the record

to establish that it has narrowly tailored its resolution concerning restrictions as to place or location of the prohibited activity.  The resolution proscribes selling merchandise in what appears to be virtually all of the public areas outside the walls of the Zoo by delineating the restricted area as the Zoo's entranceway and its adjacent pathway and parking areas.  While Metro may ultimately be able to justify such an expansive area of restriction, the present record falls short of such justification.[4] Therefore, on the record currently before the Court, the Court cannot conclude that Metro has met its burden of establishing that the resolution is narrowly tailored to achieve the stated significant interest of aesthetics.

With respect to Metro's interest in safety, Metro argues that enjoining it from enforcing the resolution would create a public safety hazard due to congestion and hazards to the public in using the walkways and entrance path of the Zoo. However, Metro has not supplied the Court adequate evidence that such is the case. *But see One World*, 76 F.3d at 1013 (district court noted the unique traffic problems caused by having 60,000 visitors per day, necessitating the need to "promote public safety and the orderly movement of pedestrians"). In fact, during the hearing and in its briefs, Metro did not cite to any incident where safety was actually compromised as a result of Higher Taste's activities at the Zoo. Therefore, on the record currently before the Court, the Court cannot conclude that Metro has met its burden of establishing that the resolution is narrowly tailored to achieve the stated significant interest of safety. The Zoo appears to be just as safe before and after the resolution.

---

[4]It is not clear, without greater detail in the resolution, for example, what is defined as the entranceway (an area that may have greater need for the exclusion of activities that are not under the direct control of Metro).

ORDER - 9

Because Metro has not met its burden in establishing that its resolution is narrowly tailored to achieve its stated significant interest, the Court concludes that, on this record, Higher Taste has sufficiently shown a likelihood that it will succeed on the merits.

**B.    Irreparable Harm**

Where a party establishes the likelihood of success on the merits, irreparable harm will also be found in injunction actions involving First Amendment challenges. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because Higher Taste has established a likelihood of success on the merits, irreparable harm is also established for purposes of the preliminary injunction stage of this matter.

**C.    Balance of Equities**

Although Metro has a significant interest in aesthetics and safety, it has not shown that the resolution is narrowly tailored to meet these interests. Accordingly, the Court concludes that granting the injunction will not accrue harm to Metro or the citizens. Further, the Court concludes that any harm that might accrue is not sufficient to warrant an unconstitutional restriction of First Amendment freedoms, which Higher Taste has established is likely the case here.

Therefore, on balance, the equities tip exclusively in favor of Higher Taste.

**D.    Public Interest**

Where a party establishes the likelihood of success on the merits, the public interest will also be implicated in injunction actions involving First Amendment challenges. *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979) (it is always in the public interest to prevent one from violating another's constitutional rights). Because Higher Taste has established a likelihood of success on the merits, the public interest element is also established for purposes of the preliminary injunction stage of this matter.

**E.     Bond**

There was no evidence offered concerning economic harm that might result should Plaintiff not ultimately prevail and therefore no bond is required at this time.

**F.     Conclusion**

Although the Court is not deciding whether the resolution is ultimately unconstitutional, it enjoins Metro from enforcing Resolution 40-05. This preliminary injunction is in effect until the matter is resolved, at which time the injunction may be lifted or permanently imposed.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Plaintiff's motion for preliminary injunction (Dkt. 2) is **GRANTED** as discussed herein.

The parties are **ORDERED** to meet and confer to determine a reasonable arrangement, consistent with this order, that enables Higher Taste to continue selling its T-shirts and otherwise conducting its free speech activities at the Zoo. If the parties cannot agree, Plaintiff may seek further relief from the Court.

DATED this 4th day of June, 2010.



_____
BENJAMIN H. SETTLE
United States District Judge

ORDER - 11